## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **SOCORRO MAYA,**<br>**#R33278,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 17-cv-00546-NJR** |
| **WEXFORD HEALTH SOURCES, INC.,**<br>**LOUIS SHICKER,**<br>**JOHN BALDWIN,**<br>**KIMBERLY BUTLER,**<br>**JACQUELINE LASHBROOK,**<br>**JOHN TROST,**<br>**HECTOR GARCIA,**<br>**STEPHEN RITZ,**<br>**REBECCA EINWOHNER, and**<br>**ANTHONY WILLS,** | |
| **Defendants.** | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Pending before the Court is a Motion for Summary Judgment filed by Defendants Baldwin, Butler, Lashbrook, and Shicker (Doc. 143) and a Motion for Summary Judgment filed by Defendants Einwohner, Garcia, Ritz, Trost, and Wexford Health Sources, Inc. (Doc. 148). For the reasons set forth below, the Court grants in part and denies in part both motions.

### BACKGROUND

Plaintiff Socorro Maya, an inmate of the Illinois Department of Corrections ("IDOC") currently incarcerated at Menard Correctional Center ("Menard"), commenced this action by filing a Complaint pursuant to 42 U.S.C. § 1983 for the deprivation of his constitutional rights. (Doc. 1). On November 19, 2018, Maya, through court recruited

counsel, filed an Amended Complaint. (Doc. 108). According to the Amended Complaint, Wexford Health Sources Inc. ("Wexford") has a policy of minimizing the health care provided to persons in IDOC custody, in order to reduce costs and maximize revenue. Specifically, Wexford and its employees (1) do not authorize surgical repair of an umbilical hernia unless the hernia has become strangulated, and instead, treat umbilical hernias with pain medication and by manually pushing the hernia back into place; (2) minimize the tests administered to determine whether an inmate is suffering from a chronic disease and if medication is an appropriate form of treatment; and (3) minimize the medical intervention provided so as to reduce the number of staff necessary to provide treatment. These policies resulted in Maya receiving inadequate medical care for his umbilical hernia, kidney disease, and diabetic condition from Wexford staff.

Maya also alleges that he has been housed in unconstitutional conditions of confinement. Menard is overcrowded, and as a result, he has been housed with a cellmate in a cell originally designed for one person. He is kept in the cell for twenty-one to twenty-three hours on many days and for twenty-four hours when the facility is on lockdown. The cell conditions are deplorable—the toilets do not work, there are repeated power outages, a lack of ventilation resulting in oppressively hot temperatures, and mold contamination. Maya only receives underclothing and socks once a year, and it is difficult to obtain washcloths, towels, and soap. These living conditions have exacerbated Maya's health conditions and caused or contributed to his high blood pressure and cholesterol and ongoing back and knee pain.

Maya is currently proceeding on an Eighth Amendment claim for deliberate indifference regarding treatment of his hernia (Count 1); an Eighth Amendment claim for

deliberate indifference regarding treatment of his diabetes and kidney damage (Count 2); and an Eighth Amendment claim for unconstitutional conditions of confinement (Count 3).

On March 3, 2020, the Court granted Maya's Motion for Preliminary Injunction. (Doc. 196). Defendants were ordered to facilitate a referral to a board certified surgeon for evaluation of Maya's umbilical hernia and to submit to the Court documentation from the medical appointment, including the surgeon's recommended treatment plan. The surgeon, Dr. Stratmann, recommended that Maya's umbilical hernia be surgically repaired, and Maya had surgery on August 6, 2020. (Doc. 211).[1]

**RELEVANT FACTS**

**I. *Unconstitutional Medical Care***

    **a. *Umbilical Hernia***

Maya first noticed a hernia after carrying his property boxes in November 2004. (Doc. 149, p. 2; Doc. 149-2, p. 25). He was diagnosed with an umbilical hernia in February 2005 and prescribed ibuprofen for pain. (Doc. 149, p. 2; Doc. 164, p. 2). It is disputed whether Maya complained of issues relating to his umbilical hernia with any medical provider from July 28, 2005, to March 1, 2007. (Doc. 149, p. 2; Doc. 164, p. 2). On March 1, 2007, Maya requested for his hernia to be removed. (Doc. 149, p. 2). At that time, the hernia was easily reducible, and the plan was to observe it. (*Id.*). On May 11, 2007, Maya reported increased pain, and the hernia was recorded as being the size of a half dollar and reducible when laying down. (Doc. 149, p. 2; Doc. 164, p. 2; Doc. 209, p. 5). Maya also

---

[1] As Maya has received surgical repair of his umbilical hernia, the Court finds his request for a permanent injunction (Count 4) moot. (*See* Doc. 108).

discussed or attempted to discuss his hernia with medical providers on May 27, 2007 (not seen), June 11, 2007, July 9, 2007, September 10, 2007, October 23, 2007, October 25, 2007, December 27, 2007, March 3, 2008, May 2, 2008, May 5, 2008, and June 11, 2008. (Doc. 149, p. 2; Doc. 164, p. 3; Doc. 134-1, p. 11-13; Doc. 141-3, p. 3-6; Doc. 149-1, p. 15). On June 19, 2008, during an appointment with a nurse practitioner, Maya reported pain during bowel movements and "when hernia 'pops out.'" (Doc. 149, p. 2; Doc. 209, p. 10). The medical entry on this date records complaints of "hernia pain on/off," and Maya also reported exercising when he goes to the yard. The nurse practitioner gave Maya a thirty day prescription of Motrin 400 mg twice per day, as needed, and explained the risks of long term use of nonsteroidal anti-inflammatory drugs ("NSAIDs"). (Doc. 149, p. 3; Doc. 164, p. 3).

Maya again complained of hernia pain on January 26, 2009. (Doc. 141-3, p. 9). During this appointment, he rated his pain at a four and was instructed to not lift anything above fifty pounds. (*Id.*; Doc. 164, p. 3). Medical records reflect that on April 1, 2009, Maya again asked for hernia repair, and the provider wrote that the hernia is "easily reduced, surgery not medically indicated." (Doc. 209, p. 20).

Defendants state that from November 2009 until November 2016, Maya did not go to the health care unit for his hernia. (Doc. 143, p. 3; Doc. 149, p. 3). Maya testified that, while he did not go to the health care unit specifically for his hernia during this time period, he would tell medical staff that his hernia was hurting at his appointments for other medical issues. (Doc. 164, p. 3; Doc. 149-2, p. 25). Medical records dated April 8, 2014, May 16, 2015, May 27, 2015, and June 24, 2015, all include notations of Maya's hernia in his medical history. (Doc. 164, p. 3). Maya has not been prescribed ibuprofen or Motrin

for his hernia since 2008. (Doc. 149, p. 3).

On December 3, 2016, Dr. Trost completed a surgical referral for a general surgical consult regarding Maya's hernia. (Doc. 149, p. 3; Doc. 209-1, p. 46). The referral was denied by Dr. Ritz, who recommended on-site conservative treatment of an abdominal binder for Maya's symptoms. (Doc. 149, p. 3; Doc. 209-1, p. 45). On January 23, 2017, Maya complained to Dr. Einwohner, a Wexford employed nephrologist who was treating Maya's kidney condition, that the abdominal binder was causing bruising and back pain. (Doc. 149, p. 3). The medical records from January 24, 2017, until November 3, 2018, do not mention Maya's hernia or record related pain. (Doc. 149, p. 3). Maya testified he told his physicians the hernia hurt all the time and denied ever telling them his hernia does not hurt. (Doc. 164, p. 4; Doc. 149-4, p. 6).

Maya was seen during nurse sick call for a renewal of his abdominal belt permit on November 3, 2018. (Doc. 149, p. 4). The nurse recorded that Maya reported intermittent pain and that his pain level could reach an eight to a nine, lasting ten to fifteen minutes in duration. (Doc. 164, p. 5). Maya testified that as of February 22, 2019, other than the abdominal binder, he was not receiving treatment for his hernia. (Doc. 149-4, p. 6).

**b.  *Diabetes***

Defendants state that in January 2005, Maya was placed on the diabetes mellitus and cholesterol chronic clinic list. (Doc. 149, p. 4). On January 11, 2005, Maya's laboratory report indicated an elevated blood glucose level and an elevated hemoglobin A1C level of 6.0. (*Id.*). On January 28, 2005, he was recorded to be positive for diabetes mellitus. (*Id.*; Doc. 149-1, p. 3). He attended his first diabetes mellitus chronic clinic on February 2, 2005. (Doc. 149, p. 4; Doc. 149-1, p. 4). Lab test results dated April 12, 2005, and August 24, 2005,

showed elevated A1C levels. Maya had a glucose tolerance test on September 28, 2005, which showed elevated glucose levels at all stages of the test. From 2005 until 2008, Maya opted out of medications and told medical staff at Menard that he preferred to use diet and exercise to control his diabetes and lipids. (*Id.*). On June 12, 2008, Maya's lab test results showed his A1C levels had risen to 8.1. (*Id.*). He was then prescribed Glipizide 10 mg twice a day and Metformin 500 mg twice a day to control his glucose levels. (*Id.*). From 2008 until 2016, Maya had several changes in his medication, received lab work two to three times a year and weekly accu-cheks, and attended the diabetes mellitus chronic clinic quarterly. (*Id.* at p. 5; Doc. 149-2, p. 31). On April 19, 2016, Maya's diabetes was listed as stable with good control. The physician assistant discontinued the Metformin, effective that day, added a low dose of Glipizide, and ordered sliding scale insulin as needed. (*Id.*). On June 9, 2016, the Glipizide was discontinued and substituted with Glimepiride. (*Id.*). As of February 22, 2019, Maya was not taking any medication to treat his diabetes. (Doc. 149-4, p. 7).

### c. *Kidney Disease*

On June 29, 2009, based on abnormal lab results, Dr. Fuentes ordered a urinalysis for Maya to rule out a urinary tract infection. (Doc. 149, p. 5). On July 26, 2009, it was noted in Maya's medical records that he was experiencing proteinuria and further urine testing, and a renal ultrasound was ordered. (*Id.*). Maya had normal creatine levels on the tests performed on June 11, 2009, and September 24, 2009. (*Id.*; Doc. 164, p. 6). A renal ultrasound was performed on August 17, 2009. (Doc. 149, p. 5). A diagnosis of possible nephrotic syndrome was recorded on September 18, 2009. Maya then discussed his lab results with Dr. Nwaobasi on September 29, 2009, who referred Maya to the medical

director for possible referral to a nephrologist. (*Id.*).

On April 28, 2016, Maya's abnormal labs showed an elevated creatinine level of 1.81, his glomerular filtration rate was calculated at 48 ml, and he was assessed to be in Stage 3 renal failure. (*Id.* at p. 6). Nurse Practitioner Moldenhauer completed a collegial referral to a urologist and noted that the Metformin had previously been discontinued on April 19, 2016. Dr. Garcia participated in the collegial review of the urology referral and recommended that renal ultrasound be taken and to further discuss the nephrologist consult once the ultrasound was completed. A renal ultrasound was completed, and Dr. Siddiqui referred Maya for a nephrologist consult and scheduled him for a follow up appointment in one month.

Maya saw Dr. Trost on July 5, 2016, for his follow up appointment. On August 8, 2016, during collegial review, Maya was referred to Dr. Einwohner, a Wexford employed nephrologist, for evaluation and recommendations. (*Id.*; Doc. 209-1, p. 41). Maya had his first appointment with Dr. Einwohner on August 22, 2016. (Doc. 149, p. 6; Doc. 209-1, p. 40). Dr. Einwohner increased Maya's Norvasc prescription, halted the Zantac prescription, ordered lab work, referred Maya back to Dr. Trost regarding his possible anemia, and suggested another appointment in October. (*Id.*). Dr. Einwohner had appointments with Maya on November 7, 2016, and January 23, 2017. (Doc. 149, p. 7; Doc. 209-1, p. 43). On March 23, 2017, Dr. Einwohner discussed Maya's condition with Dr. Ritz and recommended a renal biopsy, which was approved. (Doc. 149, p. 7; Doc. 209-1, p. 47). On March 30, 2017, Dr. Einwohner recommended that Maya see an offsite nephrologist, which Dr. Ritz approved. (Doc. 149, p. 7; Doc. 209-1, p. 52).

Maya had a renal biopsy on April 11, 2017, showing advanced membranous

nephropathy with associated segmental sclerosis and moderate arteriosclerosis. (Doc. 149, p. 7; Doc. 209-1, p. 59). Maya saw the offsite nephrologist, Dr. Koch, on June 8, 2017. On August 28, 2017, Dr. Koch prescribed Maya immunosuppressive therapy of Cytoxan and Prednisone pending specific lab results. (Doc. 149, p. 7; Doc. 209-1, p. 65-66). On September 7, 2017, Dr. Siddiqui conferenced with Dr. Koch, who advised holding off on the Tacrolimus prescription and starting the immunosuppressive therapy as ordered. (Doc. 149, p. 8; Doc. 209-1, p. 15).

Maya had another appointment with Dr. Koch on November 2, 2017, who continued treatment with Cytoxan, Prednisone, and erythropoietin analog injections. (Doc. 149, p. 8; Doc. 149-5, p. 2-3). Dr. Koch recommended "CBC" every two weeks and a monthly chemistry panel. (*Id.*). On December 1, 2017, Dr. Siddiqui recorded that Maya's blood sugar was fluctuating, and he was unable to contact Dr. Koch. (Doc. 149, p. 8; Doc. 209-1, p. 169). Dr. Siddiqui added Lantus for Maya's glucose levels. (*Id.*). Maya was placed on a twenty-three hour observation due to a hyperglycemic episode and increased blood pressure on December 6, 2017. (Doc. 149, p. 8; Doc. 209-1, p. 171). The next day, Dr. Siddiqui diagnosed Maya with uncontrolled diabetes secondary to steroids and ordered that Maya gradually be tapered off of the Prednisone but for Maya to continue the Cytoxan. (Doc. 149, p. 8; Doc. 209-1, p. 173). On February 16, 2018, Dr. Koch noted in his assessment that because the Prednisone was discontinued, he "would favor discontinuing the Cytoxan as well." (Doc. 149, p. 8; Doc. 149-5, p. 4).

## II. *Unconstitutional Conditions of Confinement*

Maya has been incarcerated at Menard since October 6, 2004. (Doc. 160, pp. 1, 4; Doc. 149-2, p. 6). He alleges that Menard is overcrowded, and he has been housed with a

cellmate in small cells designed to hold one inmate. Maya has been housed at various points in time during his incarceration in the North 1 Cell House. (*See* Doc. 143-1; Doc. 149-4, p. 8). Specifically, in May 2016, he was moved to Gallery 5, North 1, Cell 515 measuring 11 feet long, 92 inches tall, 53 inches wide; in September 2016 he moved to Gallery 6, North 1, Cell 654 measuring 11 feet long, 92 inches tall, 51.5 inches wide; in June 2017 he was moved to Gallery 5, North 1, Cell 554 measuring 11 feet long, 92 inches tall, 51.5 inches wide; he lived in South 1 from November 2017 until January 2018 when he was moved to Gallery 4, North 1, Cell 401 measuring 11 feet long, 92 inches tall, 53 inches wide; in September 2018 he was moved to Gallery 5, North 1, Cell 526 measuring 11 feet long, 92 inches tall, 53 inches wide; and in December 2018 he was moved to Gallery 5, North 1, Cell 501 measuring 11 feet long, 92 inches tall, 53 inches wide—where he resided as of February 22, 2019. (Doc. 143-1, p. 1; Doc. 149-4, p. 8-9; Doc. 160, p. 4-5).

Whether Maya remains in his cell for twenty-one to twenty-three hours on most days is disputed. (Doc. 143, p. 3; Doc. 160, p. 4-5). Maya leaves his cell for dinner, yard, gym, law library visits, showers, and when he is assigned a job. (Doc. 143, pp. 3, 19). Generally, he has two yard periods and two gym periods per week, each being between two and a half to three hours. (*Id.;* Doc. 149-2, p. 10). As of February 22, 2019, Maya was taken out of his cell for yard on Wednesdays, Saturdays, and Sundays, and for gym on Thursdays. (Doc. 149-4, p. 10). He leaves his cell three times a week for a twenty to twenty-five minute shower and can go to the library if he puts in a request. (Doc. 149-4, p. 10; Doc. 160, pp. 3, 7). It takes about a week and a half to two weeks for a request to visit the law library to be granted.

Maya has worked intermittently during his time at Menard. (Doc. 143, p. 3;

Doc. 149-2, p. 9). When working as a second shift janitor, Maya is out of his cell approximately six hours a day, from 3:00 p.m. to 9:00 p.m., up to seven days a week, when the facility is not on lockdown. (Doc. 143, p. 3; Doc. 149-4, p. 12; Doc. 160, pp. 3, 7). When Menard is on lockdown, Level Four, he works from 5:00 p.m. to 9:00 p.m., and when Menard is on lockdown, Level One, he is not let out of his cell to work and remains in the cell for 24 hours. (Doc. 149-2 pp. 5, 9; Doc. 160, p. 3). At the time of his deposition taken on January 14, 2019, Maya had been working for six weeks, seven days a week as a janitor, but he was no longer working at the time of his February 22, 2019, deposition. (Doc. 149-2, p. 10; Doc. 149-4, p. 10; Doc. 160, p. 3). He was told by Menard staff he could work again beginning March 15, 2019. (Doc. 149-4, pp. 11, 12; Doc. 160, p. 3).

The toilet in Maya's current cell has not broken, and he recalls two incidents of major flooding in his cell during his time at Menard. (Doc. 143, p. 4; Doc. 149-2, p. 11). In December 2017, water leaked from the toilet for approximately two weeks before it was fixed. (Doc. 143, p. 4; Doc. 149-2, p. 12). Maya did not personally put in a request slip to have the toilet fixed. (*Id.*). In 2018, his cellmate repeatedly pushed a button on their sink causing the button to stick and water to leak. (*Id.*). It took one day for someone to fix the leak, as the facility was on security lockdown the day the leak occurred. (*Id.*).

Maya testified that the power outages that occur are usually caused by another inmate using a "stinger," blowing the fuse. (Doc. 143, p. 4; Doc. 149-2, p. 13). It may take ten minutes to two hours for the power to turn back on in the cell. (*Id*)

Menard cells become "warm" in the summer months. (Doc. 143, p. 4-5; Doc. 149-2, p. 13). Temperatures are monitored at Menard, and when it is warm, inmates are provided ice, fans, and allowed to open chuckhole doors. (Doc. 143, p. 4-5). The

temperature of the cells and the effectiveness of the measures taken to alleviate the alleged high temperatures and poor ventilation is disputed. (Doc. 160, p. 3).

Maya's claims regarding the receipt of adequate clothing and mold contamination at Menard are also both disputed issues. (Doc. 143, p. 5).

## LEGAL STANDARDS

### I. Summary Judgment Standard

Federal Rule of Civil Procedure 56 governs motions for summary judgment. "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012) (quoting FED. R. CIV. P. 56(a)). *Accord Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enterpr., Inc.*, 753 F.3d 676, 681-82 (7th Cir. 2014).

In assessing a summary judgment motion, a district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Donahoe*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Cmty. Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014).

### II. Eighth Amendment Deliberate Indifference

The Eighth Amendment prohibits cruel and unusual punishment and deliberate

indifference to the "serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (citation omitted). A prisoner is entitled to "reasonable measures to meet a substantial risk of serious harm"—not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

In order to prevail on a claim of deliberate indifference, a prisoner who challenges constitutionally-deficient medical care must satisfy a two-part test. *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). The first consideration is whether the prisoner has an "objectively serious medical condition." *Id. Accord Greeno* v. *Daley*, 414 F.3d 645, 653 (7th Cir. 2005). "A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Hammond v. Rector*, 123 F. Supp. 3d 1076, 1084 (S.D. Ill. 2015) (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)). It is not necessary for such a medical condition to "be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). *Accord Farmer,* 511 U.S. at 828 (violating the Eighth Amendment requires "deliberate indifference to a *substantial* risk of serious harm") (internal quotation marks omitted) (emphasis added).

The second consideration requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *Greeno,* 414 F.3d at 653. A plaintiff need not show the individual "literally ignored" his complaint, but that the individual was aware of the condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). "Something

more than negligence or even malpractice is required" to prove deliberate indifference. *Pyles*, 771 F.3d at 409. Deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (citing *Gayton*, 593 F.3d at 620).

Assessing the subjective prong is more difficult in cases alleging inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources*, Inc., 839 F.3d 658, 662 (7th Cir. 2016). The Seventh Circuit has explained:

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Id.* (quoting *Zaya v. Sood,* 836 F.3d 800, 805-06 (7th Cir. 2016)). This is in contrast to a case "where evidence exists that the defendant[ ] knew better than to make the medical decision [ ] that [he] did[.]" *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016)) (alterations in original). A medical professional's choice of an easier, less efficacious treatment can rise to the level of violating the Eighth Amendment, where the treatment is known to be ineffective but is chosen anyway. *Berry,* 604 F.3d at 441.

### III. Eighth Amendment Conditions of Confinement

Prison officials violate the Eighth Amendment when "they are deliberately indifferent to adverse conditions that deny 'the minimal civilized measure of life's necessities,' such as adequate food, clothing, shelter, recreation, and medical care." *Budd v. Motley*, 711 F.3d 840, 842 (7th Cir. 2013) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834

(1994)). To succeed on a claim of deliberate indifference to a condition of confinement, a prisoner must show: (1) a deprivation that is, from an objective standpoint, sufficiently serious that it results in the denial of the minimal civilized measure of life's necessities or the denial of basic human needs; and (2) prison officials were deliberately indifferent to this state of affairs. *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (quotation marks and citation omitted); *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996). To be found liable "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

### ANALYSIS

#### I. Inadequate Medical Care

##### A. Defendants Dr. Trost, Dr. Garcia, Dr. Ritz, and Dr. Einwohner

###### a. Hernia

Defendants Dr. Trost, Dr. Garcia, Dr. Ritz, and Dr. Einwohner do not argue that Maya did not suffer from a serious medical condition regarding his hernia, but instead argue that Maya has failed to demonstrate that their decision not to surgically repair the hernia was blatantly inappropriate or outside the standard of acceptable medical practice. (Doc. 149, p. 12). Although Maya was first diagnosed with a hernia in 2005, he was not treated by Defendants until 2016. After his diagnosis, he sporadically complained of pain, but Defendants assert that there is no evidence that his pain significantly impacted his daily activities or that the hernia was incarcerated or strangulated. And, because of his comorbidities, surgical repair presented a danger or risk exceeding the potential benefits of surgery. As such, Defendants state that the decision to conservatively treat with an

abdominal binder was reasonable and based upon medical judgment. (Doc. 149).

The Court finds that there is a genuine issue of material fact regarding whether Dr. Ritz and Dr. Trost acted with deliberate indifference in treating Maya's hernia. Maya claims that for over twelve years he consistently complained about his hernia. He testified that he has pain "almost constantly" and that because of pain from his hernia he can no longer run or lift weights, has difficulty when using the bathroom, cannot walk in the yard on successive days, and cannot work "heavy jobs." (Doc. 149-4, p. 6-7). Although at times he would work six hours a day, up to seven days a week as a janitor, he stated that his job was to pass out trays to inmates in the cells and that the plastic trays were not heavy and the job did not require a lot of walking. (Doc. 149-2, p. 10).

Dr. Trost testified that "[n]ot all hernias have to be repaired. . . but if they are causing you pain, problems, incarceration et cetera, then usually that's an indication to at least be evaluated for having it repaired." (Doc. 149-6, p. 17). In the medical records, Dr. Trost refers to Maya's hernia as "longstanding" and "symptomatic, though reducible." (Doc. 209, p. 236). In denying the referral for surgical evaluation, Dr. Ritz described the hernia as greater than twenty years and recorded Maya's pain as "10/10." (Doc. 209-1, p. 45). The medical records do not explain why Dr. Ritz opted for a more conservative treatment plan, even though he was aware that Maya developed the hernia several years prior to the appointment and was in pain, and Dr. Trost testified that he did not know why his request to refer Maya to a surgeon was denied by Dr. Ritz. (Doc. 149-6, p. 18).

Neither did Dr. Trost or Dr. Ritz prescribe Maya any kind of pain medication for to help alleviate his symptoms and only provided him with an abdominal binder; the

effectiveness of which is disputed.[2] (Doc. 164, p. 7; Doc. 173, p. 4; Doc. 149-4, p. 6). Because of his kidney disease, Maya was unable to take ibuprofen, and it is also not settled whether he could have taken Tylenol for his pain.[3] Maya testified that the prescribed abdominal binder made the pain a "little bit less," but that it did not make the pain go away. (Doc. 149-2, p. 27; Doc. 149-4, p. 6). He also stated that it caused additional pain and bruising. (Doc. 149-2, p. 26). The medical record from January 23, 2017, notes that the binder was causing Maya backpain and bruising and to "refer to Dr. Trost for back pain from abdominal binder…" (Doc. 134-1, p. 23). Unfortunately, however, Maya was not seen by medical staff again for his hernia until November 3, 2018, when his abdominal binder permit was renewed. (Doc. 141-3, p. 100). At his deposition, Dr. Trost confirmed that because Maya is unable to take ibuprofen or Tylenol, he either has to live with the pain or have surgery. (Doc. 149-6, p. 32).

Based on the record and Maya's testimony, a factfinder could reasonably infer that (1) the decision by Dr. Ritz to treat Maya's hernia with only an abdominal binder after several years of complaints; and (2) Dr. Trost's failure to challenge the decision or resubmit the referral request were "blatantly inappropriate in the face of [Maya's] pain and the risk the worsening hernia poses to his present and future health." *Gonzalez v. Feinerman*, 663 F. 3d 311, 314 (7th Cir. 2011) (finding that allegations that plaintiff's hernia

---

[2] At the preliminary injunction hearing, Dr. Siddiqui admitted that abdominal binders do not treat pain. (Doc. 196, p. 6). Dr. Trost testified that the "real purpose or aim of the binder is that it…bolstered the weakened spots so whatever might be adjacent or sitting there can't come out and become incarcerated." (Doc. 149-6, p. 19). He also stated that the abdominal binder was prescribed to Maya to alleviate hernia symptoms, including pain. (*Id.* at p. 32).

[3] Dr. Daniels, Defendants' expert, reported that "Tylenol can be taken by individuals with renal insufficiency and even patients who are on dialysis." (Doc. 149-3, p. 7). Dr. Siddiqui also testified at the hearing on the motion for preliminary injunction that Tylenol is a safe pain medication. (Doc. 196, p. 6). Dr. Trost testified, however, that Tylenol is not recommended for people with kidney disease to take. (Doc. 149-6, p. 23).

pain was treated with minimal or no medication for over two years stated a claim). *See also Heard v. Ill. Dep't of Corr.*, No. 06 C 644, 2012 WL 832566, at *6 (N.D. Ill. Mar. 12, 2012) (finding that a jury could infer deliberate indifference where plaintiff's hernia was not repaired for thirteen years after it was diagnosed and the severity and frequency of the plaintiff's pain was in dispute). Simply stated, Dr. Ritz and Dr. Trost are not entitled to summary judgment on Count 1.

There is insufficient evidence, however, to support the claim that Dr. Einwohner and Dr. Garcia were involved in providing treatment for Maya's hernia and related symptoms or that either defendant was even aware that the hernia and associated pain remained untreated. Maya testified that he told Dr. Einwohner that he had hernia when she asked him whether he exercised but stated, "I never asked her what she could do about it or not, because that's not on her part, because she was hired supposedly to look after my kidneys, nothing to do with my hernia." (Doc. 149-2, p. 28). Maya also testified that he thought Dr. Garcia was involved in the decision to deny hernia surgery because "everyone was involved" in the collegial review and "if they all work for Wexford, right, and if they all have the responsibility over us, over the health problems that we have, so they have to have a meeting in general to see what is to be done…" (Doc. 149-2, p. 27). Because Maya has not offered any evidence to suggest that Dr. Einwohner and Dr. Garcia had knowledge of his ongoing hernia pain and inadequate treatment, the summary judgment motion on Count 1 is granted as to Dr. Einwohner and Dr. Garcia.

### b. *Diabetes*

Defendants argue that Maya has failed to establish that they acted with deliberate indifference in the diagnosis and treatment of his diabetes. (Doc. 149, p. 14-15). They state

that there is no evidence of a contradictory diagnosis, misdiagnosis, or difference of opinions regarding Maya's diabetes. Dr. Daniels, Defendants' expert, reported that "[t]here was never any doubt about the diagnosis of diabetes, as evidenced by his elevated blood glucose and hemoglobin a1c levels in 2007 and thereafter." (Doc. 149-3, p. 6). Maya received an abundance of testing, and Maya has not represented what the "proper" testing was that he should have received for diabetes. Based on Maya's family history of diabetes and his lab results, the providers used their medical judgment to diagnosis and treat Maya's diabetes.

Defendants further dispute Maya's assertion that he was prescribed harmful and unnecessary medication. Maya wanted to use diet and exercise, rather than medication, to manage his diabetes, but his diet was not conducive to a diabetic and included various foods high in sugar and refined carbohydrates. When his A1C levels rose to 8.1 in 2008, he was prescribed medication to regulate his glucose levels. Defendants assert that once the medications were prescribed and the dosages refined, Maya gained good control of his diabetes. (Doc. 149, p. 15; Doc. 149-3, p. 6). Additionally, there is no evidence that the medication he was prescribed caused or exacerbated his kidney disease. (Doc. 149, p. 16-17).

The Court grants summary judgment to Dr. Einwohner, Dr. Ritz, Dr. Garcia, and Dr. Trost regarding Maya's claims of deliberate indifference in the treatment of his diabetes. First, Maya claims that Dr. Garcia, Dr. Ritz, Dr. Trost, and Dr. Einwohner frustrated his ability to control his blood sugar level through regular exercise by refusing to approve his needed hernia surgery. (Doc. 108, p. 5). The Court has already ruled that Maya has not presented evidence from which it could be reasonably inferred that Dr.

Garcia and Dr. Einwohner were involved in the treatment of his hernia. Likewise, there is no evidence that Maya's inability to exercise more frequently due to his hernia has contributed to or worsened his diabetic condition or that he would have been able to properly control his blood sugar levels by exercise and diet alone, without medication. In fact, the record demonstrates the opposite. From 2005 to 2008, Maya "opted out of medications" and stated to medical staff that he would like to use diet and exercise to control his diabetes mellitus and lipids. (Doc. 149, p. 4; Doc. 164, p. 5). He was not prescribed medication until 2008, when his efforts were unsuccessful and his A1C level had reached 8.1. (Doc. 149, p. 4). On August 19, 2016, his diabetes and hypertension were documented as stable with good control, and Dr. Daniels reported that "Maya's diabetes has been under excellent glucose control with the medications that he received." (Doc. 149-3, p. 6). As of his deposition on February 22, 2019, Maya was no longer taking medication to control his blood sugar levels at all. (Doc. 149-4, p. 3). Accordingly, Maya has not established a triable issue on whether Dr. Trost and Dr. Ritz were deliberately indifferent to his diabetic condition by not referring him for a surgical evaluation.

Second, Maya claims that Dr. Trost, Dr. Ritz, Dr. Garcia, and Dr. Einwohner did not conduct proper testing to assess for diabetes and to determine whether medication was necessary. (Doc. 108, p. 5). Maya has not presented any evidence that Dr. Ritz, Dr. Garcia, or Dr. Einwohner were personally involved in the diagnosis or treatment of his diabetes. Dr. Ritz and Dr. Garcia were not onsite providers, and their roles in Maya's medical care were limited to reviewing and analyzing medical referrals as needed. Dr. Einwohner treated Maya for his kidney condition. All three Defendants became involved with Maya's medical care eight years after he was first prescribed medications to treat his

diabetes and also after the Metformin prescription, which Maya alleges has contributed to or caused damage to his kidneys, had been discontinued in 2016. (Doc. 209-1, p. 69). Maya testified that during an appointment Dr. Einwohner she stated that she was surprised Maya was diabetic, and then at a subsequent appointment, Dr. Einwohner informed him she could not give him information on his diabetic condition because she was not a specialist in diabetes and was there to treat his kidneys. (Doc. 149-2, p. 36). Although she declined to discuss his diabetic condition, Dr. Einwohner referred him back to Dr. Trost for his diabetes concerns and management. She noted in the record that Maya questioned if he was diabetic. (Doc. 149, p. 7; Doc. 209-1, p. 45). Assuming that Dr. Einwohner became aware of issues with Maya's treatment for his diabetes through this conversation, she did not act with deliberate indifference but noted his concerns in the record and referred him to Dr. Trost for a follow up. Because Maya has failed to put forth any evidence to support a jury finding that Dr. Garcia, Dr. Ritz, or Dr. Einwohner knew of and disregarded an excessive risk to his health regarding his diabetic condition, summary judgment will be granted.

Maya also has failed to provide any evidence to support his claim that Dr. Trost never conducted proper testing for his diabetes. Maya testified that he believes he is not diabetic because a nurse practitioner told him in 2016, based on his lab test results, he was not diabetic. (Doc. 149-2, p. 30-31). Maya stated that when he asked Dr. Trost to have a specialist conduct additional tests, Dr. Trost informed him that the blood tests had already been done and "they" were the only ones who did the blood tests for Menard. (Doc. 149-2, p. 34). Maya claims that since the suspension of Metformin and other diabetic medications in the Spring of 2016, he has not suffered ill effects from diabetes, thus

indicating that those medications were unnecessary and harmful. (Doc. 108, p. 8; Doc. 149-2, p. 31, 33).

Dr. Trost testified that an A1C level above six "is considered to indicate diabetes or poor glucose control[.]" (Doc. 149-6, p. 27). When asked what tests could be performed to determine whether or not a patient has diabetes, Dr. Trost answered that "'[t]here is hemoglobin A1C level, which is a good indicator of blood sugar levels over about a three-month period" and there is a glucose tolerance test which "is the gold standard." (Doc. 149-6, pp. 26, 28). Maya was given both these tests at Menard. The record indicates that he was given a glucose tolerance test on September 28, 2005 (Doc. 149, p. 5; Doc. 149-1, p. 33), and June 20, 2013 (Doc. 149-6, p. 27; Doc. 209-1, p. 109). Dr. Trost testified that the glucose tolerance test performed in 2013, a few months before he started at Menard, indicated that Maya had diabetes mellitus. (*Id.*). The lab work performed while Dr. Trost worked at Menard showed elevated A1C levels on November 3, 2014, March 3, 2015, and November 3, 2015. (Doc. 209-1, pp. 116, 117, 123). Dr. Trost stated that it was "clearcut" that Maya was diabetic due to his "countless elevated A1Cs." (Doc. 149-6, p. 28).

Maya admitted that blood work had been performed on him two to three times a year since 2005 and around twenty lab tests reported his A1C levels at above 6.0. (149-2, p. 32). He also stated that he does not have any knowledge regarding the tests physicians use to diagnose diabetes. (*Id.* at p. 30-31). Nothing in the record supports the allegation that Dr. Trost was deliberately indifferent by not referring Maya for further blood tests or that Maya was misdiagnosed. Dr. Trost's assessment that Maya had diabetes is supported by Dr. Daniels's report, which states "[t]here was never any doubt about the diagnosis of diabetes, as evidenced by his elevated blood glucose and hemoglobin a1c

levels in 2007 and thereafter." (Doc. 149-3, p. 6). Although in the last few years Maya has not needed medication to control his diabetes, Dr. Daniels reported that:

> This is quite common in individuals who have significant renal disease. Insulin is excreted by the kidneys, and when an individual develops decreased renal function, an individual's endogenous insulin become more effective and medication requirements to control blood glucose decrease and even cease.

(*Id*.). Other than Maya's speculation that he required additional diabetes testing or that the medication prescribed was unnecessary for managing his blood glucose levels; he has not presented any evidence to support a reasonable inference in favor of his allegation.

Maya also alleges that Dr. Trost failed to conduct tests to determine the proper medication to treat his diabetes and prescribed him harmful medications despite actual knowledge that Maya suffered from decreased kidney function. (Doc. 108, p. 6). On July 26, 2009, following a urine analysis, "renal impairment" was documented in Maya's medical records, and a renal ultrasound was performed. (Doc. 149-6, p. 25; Doc. 209, p. 24). Maya's diagnosis of possible nephrotic syndrome was made, and on September 29, 2009, Maya discussed his lab results with a doctor at Menard who referred him to the medical director for possible referral to nephrologist. (Doc. 149, p. 5; Doc. 209, p. 28). Maya was prescribed Metformin and Glipizide to treat his diabetes from 2008 until 2016.

Maya has not offered any evidence to support his claim that Glipizide is not recommended for individuals with decreased kidney function and can exacerbate kidney disease. Whether Maya should have been prescribed and continued taking Metformin for his diabetes after the labs results showed decreased kidney function in 2009, however, remains a disputed fact. According to Dr. Daniels,

> There is no evidence in the medical literature that metformin or glipizide

result in renal damage. Metformin is indeed contraindicated in patients
with significant renal failure (creatinine levels of greater than 1.4), but not
because the metformin damages the kidneys. Rather, there is an increased
incidence of lactic acidosis, a rare complication of metformin use, in
individuals with renal insufficiency. In fact, the metformin prescribed for
Mr. Maya was discontinued appropriately when his creatinine rose above
1.4.

(Doc. 149-3, p. 6). Maya testified that when he asked Dr. Koch, the outside nephrologist

who treated his kidney disease, whether "the problem could be that I was taking

medication for diabetes…he told me that, no, he didn't see that that can be the problem."

(Doc. 149-4, p. 3). Contrary to Dr. Koch and Dr. Daniels, Dr. Trost testified that Maya

should not have been on Metformin, as it can cause further damage to the kidneys and is

"not an ideal medication, diabetic medication in the setting of someone with renal

insufficiency." (Doc. 149-6, p. 13, 26).

Despite this disputed fact, Maya has not demonstrated that Dr. Trost acted with

deliberate indifference in regard to his Metformin prescription. Maya claims that Dr.

Trost continued to prescribe Metformin "despite actual knowledge from a renal

ultrasound performed in 2009 that Plaintiff suffered from decreased kidney function[,]"

but Maya has not presented any evidence for a jury to conclude that Dr. Trost did in fact

have knowledge of Maya's kidney damage. (Doc. 108, p. 6). Dr. Trost renewed Maya's

Metformin prescription on one occasion on August 7, 2015. (Doc. 149, p. 16). And

although Dr. Trost testified that Metformin is not an appropriate medication for

individuals with renal insufficiency, he also stated that he was not aware of the 2009

medical records documenting that Maya suffered from renal insufficiency. (Doc. 149-6,

p. 31). Dr. Trost testified that the paper method of record keeping at Menard is a "poor

archaic system" and that the 2009 records probably were not included in Maya's chart,

which contains a patient's medical history from the previous five years for the provider to review prior to an appointment. (Doc. 149-6, pp. 8, 31). Maya has not offered any evidence to refute his testimony showing that he did not have actual knowledge that Maya was suffering from decreased kidney function. Dr. Trost's failure to review all of the medical records or perform a certain test prior to renewing Maya's prescription for Metformin, while maybe negligent or poor professional judgment, does not amount to deliberate indifference. *See Johnson v. Doughty,* 433 F.3d 1001, 1013 (7th Cir. 2006) (ruling that it is not enough to show that a doctor should have known a medical treatment was necessary; "rather, the doctor must know that [the treatment] was necessary and then consciously disregard that need in order to be held deliberately indifferent.").

Accordingly, summary judgment will be granted to Dr. Trost, Dr. Ritz, Dr. Garcia, and Dr. Einwohner as to Maya's claims regarding inadequate treatment of his diabetes.

### c. *Kidney Disease*

Defendants also argue that there is no evidence that they acted with deliberate indifference to Maya's chronic kidney disease. Following abnormal lab results on April 28, 2016, Dr. Garcia and Dr. Trost participated in a collegial review for a urology referral requested by a nurse practitioner at Menard. Dr. Garcia recommended obtaining a renal ultrasound first to determined, anatomically, the condition of Maya's kidneys, and once completed, discuss a nephrologist consult. This was Dr. Garcia's only involvement in Maya's medical care. After receiving the results, on August 8, 2016, Dr. Ritz and Dr. Trost participated in a collegial review regarding a nephrology consult, and Dr. Ritz referred Maya to Dr. Einwohner. Dr. Einwohner saw Maya on August 22, 2016, November 7, 2016, and January 23, 2017. On March 22, 2017, Dr. Einwohner recommended a renal biopsy,

which was immediately approved and completed less than one month later. The hospital's request for a pre-biopsy ultrasound was also approved. On March 30, 2017, Dr. Einwohner recommended that Maya see an offsite nephrologist, which was approved by Dr. Ritz. Dr. Einwohner and Dr. Trost were no longer involved in Maya's medical care after March 2017, and Dr. Ritz continued to approve follow up consultations with Dr. Koch in July 2017, September 2017, and April 2018. Defendants argue that Dr. Ritz never denied any of Maya's nephology consultations. (*Id.* at p. 20).

Maya claims that Dr. Ritz, Dr. Trost, Dr. Garcia, and Dr. Einwohner were aware of his kidney disease, but continued to prescribe and dispense medications which caused or contributed to cause his kidney disease, not only diabetic medications, but also Motrin, ibuprofen, and acetaminophen. (Doc. 108, p. 15). This claim is not supported by the record. There is no evidence that Dr. Ritz, Dr. Trost, Dr. Garcia, or Dr. Einwohner prescribed Maya Motrin, ibuprofen, or acetaminophen. And as previously discussed, Dr. Ritz, Dr. Garcia, and Dr. Einwohner were not involved in the treatment of Maya's diabetes, and there is no evidence that they ever prescribed medicine to treat his diabetes. Dr. Trost recommended that Maya take ibuprofen for chest pain on March 17, 2104, and renewed his prescription for Metformin on August 7, 2015; however, the Court has already found that Maya has not presented sufficient evidence for a jury to conclude that Dr. Trost knew that Maya had a possible diagnosis of nephrotic syndrome. (Doc. 209, p. 148; Doc. 149-6, pp. 11, 26). Finally, the Court notes that Maya testified that it had been many years since he was prescribed ibuprofen or Motrin. (Doc. 149-2, p. 34).

Maya also asserts that Dr. Trost, Dr. Ritz, Dr. Garcia, and Dr. Einwohner were aware of the decline of Maya's renal function and his continuing kidney disease, yet

failed to facilitate the course of treatment prescribed by Dr. Koch by refusing to arrange for appropriate monitoring and lab work. This claim is also not supported by the record. Maya did not begin treatment with Dr. Koch until June 8, 2017, and Dr. Trost and Dr. Einwohner were no longer involved in Maya's care following March 2017. Similarly, Dr. Garcia also was only involved in Maya's medical care on May 4, 2016, when he denied the urology referral and recommended a renal ultrasound. There is no evidence to suggest that these Defendants were involved in Maya's medical treatment once he started seeing Dr. Koch.

Additionally, while Dr. Ritz referred Maya to Dr. Einwohner for an evaluation, approved Dr. Einwohner's recommendation for Maya to see an offsite nephrologist, and approved follow up consultations with Dr. Koch in July 2017, September 2017, and April 2018, (Doc. 149, pp. 7, 20), there is no evidence to suggest that Dr. Ritz had any involvement in facilitating the course of treatment or arranging the collection and monitoring of lab work requested by Dr. Koch or that Dr. Ritz knew Dr. Koch's orders were not being properly carried out by staff at Menard.

Accordingly, Maya has not put forth admissible evidence showing that there is a genuine dispute of material fact for trial, and summary judgment on Count 2 will be granted to Dr. Trost, Dr. Ritz, Dr. Garcia, and Dr. Einwohner.

### B. *Defendants Baldwin, Butler, Lashbrook, and Shicker*

Defendants Baldwin, Butler, Lashbrook, and Shicker do not contest that Maya suffered from serious medical conditions. Rather, Defendants argue that they are not responsible for providing direct medical care to prisoners, they did not provide Maya direct medical treatment, and Maya cannot produce evidence or demonstrate that they

had personal knowledge of a substantial risk to his health and then disregarded that risk. (Doc. 143, p. 11).

Maya alleges that "Shicker, Butler, Baldwin, and Lashbrook has actual knowledge of [his] umbilical hernia, the refusal of Wexford to treat it appropriately because of Wexford's policy, the ongoing and significant pain experienced[,] and the impact of that ongoing pain upon him." (Doc. 108, p. 5). He argues that Butler and Lashbrook were aware of the inadequate treatment he was receiving regarding his hernia because he made his complaints known through repeated grievances and letters. Maya further claims that Shicker, Butler, and Baldwin were each personally aware of his concern about his diabetes diagnosis, the damage to his kidneys caused by medication, and the decline of his renal function and continuing kidney disease, but despite their knowledge they did not intervene to insist on proper treatment, including facilitating the course of treatment planned by Dr. Koch.

The Court finds that Defendants Butler, Lashbrook, Shicker, and Baldwin are entitled to summary judgment as to Counts 1 and 2. Maya testified that he has never met with or written letters to John Baldwin, the former director of IDOC, or Louis Shicker, the former medical director for IDOC. (Doc. 149-2, p. 19-20). Maya has not presented any evidence that Baldwin and Shicker knew of his medical conditions or had any personal involvement in his treatment. As he cannot establish liability solely based on the fact that they held supervisory roles, the Court grants summary judgment to Shicker and Baldwin. *See Sanville v. McCaughtry,* 266 F. 3d 724, 740 (7th Cir. 2001) (*respondeat superior* liability is not applicable in Section 1983 claims).

His contact with the former wardens of Menard, Jacqueline Lashbrook and Kim

Butler, was also limited. Maya testified that he wrote several letters to Butler that he was having health problems, but she never answered, and he does not know if she even received the letters. (Doc. 149-2, p. 18-19). Three years ago, he attempted to speak with her as she passed through the cell house, and Butler responded that she could not stop to talk. (*Id.*). As for Lashbrook, Maya testified that he could not "recall if I sent her one or two" letters and that one of the letters was written regarding his hernia pain. He did not receive a response and does not have any evidence that she received the letter. (*Id.*). "The fact that [Maya] sent a letter or letters to [Lashbrook and Butler] is insufficient to create a genuine issue of material fact. . ." *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006) (overruled on other grounds). The record must indicate that Butler and Lashbrook actually received and read the correspondences. *Id.* Here, it does not.

Both Butler and Lashbrook attest that they "do not recall receiving any letters or having any face-to-face conversations" with Maya. (Doc. 143-5, p. 2; Doc. 143-6, p. 1). Additionally, the grievances that Maya submitted regarding lack of medical treatment for his hernia were filed in 2007 and 2008, years before Butler or Lashbrook worked at Menard (*see* Doc. 160, p. 9), and he did not start receiving treatment from Dr. Koch until 2017, after Butler was no longer employed at Menard. In sum, the record is void of any indication that Butler and Lashbrook were aware of Maya's complaints from his letters, grievances, or otherwise. There is insufficient evidence for a jury to find that Butler and Lashbrook were deliberately indifferent to Maya's medical needs. Accordingly, summary judgment is also warranted in their favor. *See Jones v. Drew*, 221 F. App'x 450, 454 (7th Cir. 2007) (affirming summary judgment for a warden where there was no evidence the warden personally received or read the communications since he delegated review of

prisoner complaints to others within his office).

### C. Wexford

Maya claims that Wexford has a policy of (1) not approving surgical repair of a hernia unless the hernia becomes strangulated; and (2) treating umbilical hernias that are not strangulated by manually pushing the hernia back into place. (Doc. 108, p. 4). This policy resulted in deliberate indifference to Maya's serious condition because surgery was repeatedly not authorized, no matter the complaints of pain, unless his hernia became strangulated. (*Id.* at p. 13). Maya asserts that Shicker, Butler, Baldwin, and Lashbrook were aware of Wexford's policy of performing repair surgery only if the hernia became strangulated. (*Id.* at p. 13-14). He further alleges that in order to maximize revenue Wexford also maintains a policy of minimizing (1) the tests administered to inmates to determine whether such persons suffer from chronic diseases such as diabetes and whether medication is appropriate to treat them; and (2) the medical intervention provided to inmates in order to reduce the number of staff necessary to provide treatment. (*Id.* at p. 6). This policy resulted in conflicting diabetes diagnoses, receiving unnecessary and harmful medications, and not seeing appropriate specialists, including nephrologists, in a timely manner. (*Id.* at p. 16). He asserts that Shicker participated and approved the implementation of this policy.

Wexford is a private corporation, but the Seventh Circuit held that the *Monell* theory of municipal liability applies in Section 1983 claims brought against private companies that act under color of state law. *See, e.g.*, *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782 (7th Cir. 2014) (noting that every circuit court that has addressed the issue has extended the *Monell* standard to private corporations acting under color of state law). To

prevail on his *Monell* claim, Maya needs to show that Wexford's policy, practice, or custom, caused a constitutional violation. *See Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009).

### a. Hernia Policy

Wexford argues that Maya has failed to establish that a Wexford policy was the cause of Defendants' actions. (Doc. 149, p. 13). Maya's claim that Wexford has a "policy of refusing to authorize hernia surgery, no matter the complaints of pain, unless the hernia is strangulated" misinterprets the guidelines regarding hernia treatment as mandatory or binding. Wexford states that the guidelines are based on accepted medical literature and practice and specify that all decisions are made on a case-by-case basis and are "not intended to replace hands on clinical judgment." (*Id.*; Doc. 153).

Other courts have considered Wexford medical guidelines for treating hernias that are similar, if not identical, to those at issue in this case and found that a reasonable jury could find that Wexford's hernia treatment policy "was unconstitutional as to patients with hernias that are not strangulated or incarcerated because it does not account for the pain caused by the hernia." *Heard,* 2012 WL 832566, at *8. *See also Wilder v. Wexford Health Sources, Inc.,* No. 11 C 4109, 2015 WL 2208440, at *10 (N.D. Ill. May 8, 2015); *Gills v. Coe,* No. 13-cv-791-DGW, 2017 WL 679914, at *8-9 (S.D. Ill. Feb. 21, 2017). Nonetheless, Maya has failed to show a causal connection between Wexford's guidelines and the inadequate treatment of his hernia provided by Dr. Trost and Dr. Ritz. *See Rice ex rel. Rice v. Corr. Med. Serv.,* 675 F. 3d 650, 675 (7th Cir. 2012). Maya testified that he was told by Dr. Trost that he was not approved for hernia surgery because of the cost. (Doc. 149-2, pp. 28-29; Doc. 149-4, p. 3; Doc. 164, p. 7). This testimony is not sufficient evidence for a jury to

conclude that the treatment decisions of Dr. Trost or Dr. Ritz were based on Wexford guidelines regarding surgical repair of hernias. Dr. Trost testified that he has "never used the guidelines to direct [his] practice[,]"and during his deposition, Dr. Trost was not even familiar with some of the terms used in the guidelines. (Doc. 149-6, p. 24). As previously discussed, the record does not contain any indication of why Dr. Ritz denied the request for referral to a general surgeon and opted for a more conservative treatment plan. The Wexford guidelines state "[d]ecisions regarding patient suitability for consideration of abdominal wall herniorrhaphy must be made on a case-by-case basis…and are not intended to replace hands-on clinical judgment." (Doc. 153, p. 2). Maya testified that it is the doctors, not Wexford, who have control "over what we can be given and what we cannot be given…as far as health care." (Doc. 149-2, p. 20). He also stated that he has never seen any policies and procedures from Wexford. (Doc. 149-4, p. 2). Based on the record, Maya has not provided any evidence that Dr. Trost or Dr. Ritz acted pursuant to Wexford guidelines or policy when providing him treatment. Therefore, summary judgment shall be granted to Wexford on Maya's hernia claim. *See Wilson v. Wexford Health Sources, Inc.*, 932 F. 3d 513, 521-22 (7th Cir. 2019).

### b.  *Policy of Minimizing Tests and Medical Intervention*

Because the Court has determined that Maya has failed to present enough evidence for a jury to infer that Defendants caused him to suffer a constitutional violation as to the treatment of his diabetes and kidney disease, Wexford cannot be held liable for maintaining an unconstitutional policy or practice of minimizing testing and medical intervention. *See also King ex rel. King v. E. St. Louis Sch. Dist.* 189, 496 F.3d 812, 817 (7th Cir. 2007) ("there can be no municipal liability based on an official policy under *Monell* if

the policy did not result in a violation of [the plaintiff's] constitutional rights."). The Court also finds that Maya has not presented any evidence that Wexford has such a blanket policy, either formal or informal. He testified that he has never seen any documentation regarding a policy of minimizing medical tests and that he came by this belief based on what other inmates have told him. (Doc. 149-4, p. 2). Accordingly, Wexford is entitled to summary judgment.

## II. Conditions of Confinement

Defendants Baldwin, Butler, and Lashbrook [4] argue that Maya has failed to establish that he was housed in conditions that resulted in extreme deprivations and that Defendants knew about the substantial risk to his safety and failed to take responsible steps to resolve the situation. (Doc. 143, p. 18-20). They state that the injuries Maya claims to have suffered over a fifteen year period at Menard as a result of his living conditions are *de minimis* at most.

Defendants point to Maya's testimony, in which he admits that the issues with plumbing and power are largely caused by other offenders and are responded to and repaired within ten minutes to two weeks. (Doc. 143, p. 18-19). Maya is able to recall only two incidents of flooding due to plumbing, one in 2017 and one in 2018, and testified that if there is an issue with plumbing, he may put in a work order or inform an employee, and the issue will be fixed. (Doc. 143, p. 19; Doc. 149-2, p. 12). Although he alleges having

---

[4] In the First Amended Complaint, Maya brings his claim of unconstitutional conditions of confinement, Count 3, against Butler, Baldwin, and Lashbrook. (Doc. 108, p. 17-18). In his Response in Opposition to the Motion for Summary Judgement filed by IDOC Defendants Baldwin, Butler, Lashbrook, and Shicker, Maya argues Shicker was also deliberately indifferent to the Maya's conditions of confinement. (Doc. 160, p. 14). Because "a plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment[,]" the Court will not consider these arguments against Defendant Shicker pertaining to Count 3. *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002) (quoting *Shanahan v. City of Chi.*, 82 F.3d 776, 781 (7th Cir. 1996)).

issues receiving clothing, he has never grieved the clothing issue and the clothing log and his commissary records demonstrate he has received and purchased clothing. (Doc. 143, p. 19; Doc. 143-9, p. 1-2). He also testified that the power outages last from ten minutes to two hours at the most. (Doc. 149-2, p. 13). Defendants state that Menard staff monitor the temperatures and provide inmates with fans and ice, and allow inmates to keep chuck holes open to facilitate air movement. (Doc. 143-5, p. 2). As for the complaint about mold, they state Maya admits the last time he had an issue with mold was in either 2013 or 2014. (*Id.*; Doc. 149-2, p. 16). Finally, Maya is able to leave his cell for meals, gym, yard, work, showers, and library, contrary to his claims that he is kept in his cell with a cellmate for twenty-two to twenty-three hours a day. (Doc. 143, p. 19). These complaints do not rise to "extreme deprivations [that] are required to make out a conditions-of-confinement claim." (Doc. 143, p. 18) (citing *Henderson v. Sheahan,* 196 F.3d 839, 845 (7th Cir. 1995)).

Defendants further argue that not only does the record reflect that actions have been taken by Menard staff to ensure any issues with the living conditions are responded to and remedied, but Maya has not demonstrated that Defendants knew and disregarded an excessive risk to his health or safety. (Doc. 143, pp. 17, 20). The involvement of Butler and Lashbrook regarding Maya's claims is limited. Maya states he is not sure if he ever wrote a letter to Butler regarding conditions at Menard and does not know if Butler received any of his letters. He attempted to speak to Butler on one occasion in 2016, but the two did not have a conversation. Butler also argues that Maya was not moved to Gallery 6, Cell 654 until September 2016, six months after she left Menard full time and the same month she left Menard permanently. (Doc. 176, p. 3). As for Lashbrook, Maya wrote her one letter relating to clothing and conditions but testified he does not have copy

or know if Lashbrook ever received the letter. He also tried to speak with her in 2018 and 2019, but the two did not have a conversation. Butler and Lashbrook claim they relied on cell house staff to carry out the day-to-day administrative duties within the cell house. Butler and Lashbrook argue they did not have direct personal involvement and were not personally aware of Maya's complaints, and so, cannot be liable. (Doc. 143, p. 20).

Finally, Defendants state that Maya did not meet Baldwin or write him any letters, and he cannot produce evidence or demonstrate that Baldwin had personal knowledge of a substantial risk to his health and safety and disregarded that risk. (*Id.* at p. 21).

The Court finds that Maya's allegations of faulty plumbing, mold in his cell, and inadequate clothing do not amount to constitutional violations. During the course of fifteen years, he alleges two plumbing incidents—the leaking toilet in his cell was fixed after two weeks, even though he personally did not put in a request for repair, and the broken sink was fixed the next day. As to his claims regarding mold in his cells, first, Maya's belief that there is mold contamination in his cells, causing his nostrils and neck to burn and eyes to tear, is based on information told to him by other inmates, and he has not presented any evidence other than his own speculation that there is mold in the cells. (Doc. 149-2, pp. 16, 22). *See Hedberg v. Ind. Bell Tel. Co., Inc.,* 47 F.3d 928, 932 (7th Cir. 1995) (noting that "[s]peculation does not create a *genuine* issue of fact[.]"). Furthermore, Maya cannot point to a specific instance of mold exposure and could not remember the last time he was housed in a cell that had a mold problem. He stated it was either in 2013 or 2014 when he was housed in Gallery Six but later presented conflicting testimony that he was housed in Gallery Five during 2013 and 2014. (Doc. 149-2, p. 16; Doc. 149-4, p. 8). He testified that since 2013 or 2014 he has not had an issue with mold because he has either

been placed in cell where is it "better" or "if it's bad…I ask for paint…and then I paint it." Maya stated that when he paints the cell "everything's fine." (Doc. 149-2, p. 16). Finally, Maya claims that (1) when he arrived at Menard he did not receive clothes for sixty days; (2) he put in a request for clothes in 2017, and although they did not have t-shirts in his size, he received a shirt, a pair of pants, and a sheet; and (3) in the fall of 2018, he put in a request for clothes but as of January 14, 2019, he had not received clothes or a response to his request. (Doc. 149-2, p. 17). The record indicates that Maya has repeatedly been provided clothing during his time at Menard. (Doc. 143-9). Specifically, in 2017, a year prior to his most recent clothing request, he received 2 t-shirts, 2 pairs of shorts, 1 pair of pants, 1 shirt, and 3 pairs of socks. (Doc. 143-9, p. 2).

Based on his testimony and the record, Maya has not made an objective showing to support his claim that he was exposed to mold and waste and provided inadequate clothing creating an excessive risk to his health and safety in violation of the Eighth Amendment. (Doc. 108, p. 17). *See Cobian v. McLaughlin,* 804 F. App'x 398, 399 (7th Cir. 2020).

The Court finds that Maya has, however, established a triable issue of fact with respect to his claims that he was held in a small cell with a cellmate for long periods of time, in excessive heat intensified by poor ventilation and lack of power. "It is well established that individuals can be harmed by placement in cells that are unconstitutionally small, even if they have occasional opportunities to leave their cells and have not sought medical treatment from problems related to cell size." *Randle v. Baldwin,* No. 16-CV-1191-NJR, 2020 WL 1550638, at *15 (S.D. Ill. Apr. 1, 2020) (citations omitted). In *Turley v. Lashbrook,* No. 08-07-SCW, 2018 WL 7585236 (S.D. Ill. 2018), the

Court addressed the issue of double celling in similar sized cells, and the Court ruled that the "Cells in the North 1 cell house are too small to house two grown men for any extended period of time." The Court further found that,

> [T]he practice of double celling inmates in North I over an extended period, even when taking into account ideal conditions wherein the inmates receive all scheduled recreation, programming, and meals outside of the cell, provides those inmates inadequate living space to meet the 'minimal civilized measure of life's necessities.' These conditions are so extreme that they also cause an excessive risk to inmates' mental and physical health.

*Id.* Given this decision, "there is a clear argument that conditions were not constitutional." *Randle*, 2020 WL 1550638, at *5. Furthermore, these conditions were exacerbated by high temperatures. Defendants do not dispute that it becomes "warm" in cells at Menard but state that inmates are provided ice, fans, and allowed to open chuckhole doors to improve ventilation. (Doc. 143, p. 5). Maya claims that these measures are not effective. (Doc. 160, p. 3). He testified that his cell could reach up to 100 degrees when the fans were unable to run due to power outages, and the small window in his cell does not provide ventilation. (Doc. 149-2, p. 13-14). Maya's testimony regarding the extreme temperatures in his cells "is sufficient to create a genuine dispute of fact." *Jose-Nicolas v. Buter,* No. 15-cv-01317-NJR-DGW, 2018 WL 7020205, at *4 (S.D. Ill. Dec. 19, 2018) (citing *Jordan v. Milwaukee Cty.,* 680 F. App'x 479, 483 (7th Cir. 2017)). Thus, a jury could reasonably find that the combination of being double celled in a small cell along with excessive heat, lack of ventilation, and frequent power outages interfering with the efficiency of the fans created conditions that denied Maya the basic necessities of civilized life. *See Isby v. Brown,* 856 F. 3d 508, 522 (7th Cir. 2017).

The Court also finds that there is a question of fact as to whether Baldwin, Butler,

and Lashbrook disregarded the substantial risk of harm to Maya's safety and failed to take reasonable measures to abate it. Maya testified that he was not sure if he wrote Butler any letters regarding living conditions at Menard, he wrote one letter to Lashbrook regarding clothing and did not receive a response, and he did not write any letters or speak with Baldwin. (Doc. 149-2, p. 18-20). While Defendants may have had little or no knowledge of Maya's placement in the North 1 Cell House,

> [t]he long history of double-celling at Menard, the numerous lawsuits that have resulted from the practice and the periodic rebukes given to IDOC by this Court leave little room for doubt that the warden[s] of Menard and the head of IDOC were aware of the individualized consequences of their broader logistical and budgetary decisionmaking and ultimately had direct personal involvement in double-celling inmates such as [Plaintiff].

*Randle,* 2020 WL 1550638, at *5. Because Baldwin, Butler, and Lashbrook may be found to have been put on notice by other proceedings that have alleged similar constitutional violations, they are not entitled to summary judgment. *Turley v. Rednour*, 729 F.3d 645, 653 (7th Cir. 2013). *See also Lightfoot v. Walker,* 486 F. Supp. 504, 511 (C.D. Ill. 1980); *Munson v. Hulick,* No. 10-cv-52-JPG, 2010 WL 2698279 (S.D. Ill. July 7, 2010); *Wallace v. Baldwin,* No. 18-CV-1513-NJR-MAB, 2019 WL 6036742 (S.D. Ill. Nov. 14, 2019).

## III. Qualified Immunity

Defendants Baldwin, Butler, Lashbrook, and Shicker claim that they are entitled to qualified immunity on all counts. To determine whether an official is entitled to qualified immunity, the Court must assess (1) whether a constitutional right would have been violated on the facts alleged, and (2) whether the right alleged to have been violated was clearly established. *Saucier v. Katz*, 533 U.S. 194, 200 (2001).

Here, the Court has granted summary judgment on all counts except Count 3

against to Baldwin, Butler, and Lashbrook for unconstitutional cell size, excessive heat, and poor ventilation. If, as Maya alleges, he was double-celled in a cell that was so small as to violate the minimum standards of decency, it would amount to a constitutional violation. This violation would be clearly established, for the Supreme Court and courts within this circuit have repeatedly addressed how excessively small cells and overcrowding can violate the Eighth Amendment, even discussing this in relation to Menard specifically.

Similarly, Baldwin, Butler, and Lashbrook are not entitled to qualified immunity based on their positions—while supervisory prison officials must be shown to have personal involvement in constitutional violations, it is clearly established that they too may be found liable. Accordingly, the Court denies qualified immunity on Count 3.

DISPOSITION

For the reasons provided, the Court **GRANTS in part** and **DENIES in part** the Motion for Summary Judgment (Doc. 143) filed by Defendants Baldwin, Butler, Lashbrook, and Shicker. The motion is granted as to Count 1 and Count 2 but is denied as to Count 3 against Baldwin, Butler, and Lashbrook.

The Court also **GRANTS in part** and **DENIES in part** the Motion for Summary Judgment (Doc. 148) filed by Dr. Einwohner, Dr. Garcia, Dr. Ritz, Dr. Trost, and Wexford. The motion is granted as to Count 1 against Dr. Einwohner, Dr. Garcia, and Wexford but is denied as to Dr. Trost and Dr. Ritz. The motion is granted as to Count 2.

Accordingly, the claims against Dr. Einwohner, Dr. Garcia, Wexford, and Shicker are **DISMISSED with prejudice**. The Clerk of Court shall terminate them as defendants and enter judgment in their favor at the conclusion of the entire action. This action will

proceed on Count 1 (Eighth Amendment claim for deliberate indifference regarding treatment of Maya's hernia) against Dr. Trost and Dr. Ritz and Count 3 an Eighth Amendment claim for unconstitutional conditions of confinement against Baldwin, Butler, and Lashbrook.

A telephone conference will be set at a later date (when the suspension of jury trials in the district due to COVID-19 has ended) to set firm dates for a final pretrial conference and jury trial. In the meantime, the parties are encouraged to discuss whether a settlement conference would be beneficial and, if so, request a referral to a magistrate judge for that purpose.

**IT IS SO ORDERED.**

**DATED:   September 14, 2020**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**